**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WARREN GILLESPIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 21-CV-04547 |
| v. | ) |
| | ) |
| PNEUMATIC CONVEYING, INC. | ) Magistrate Judge Jeffrey T. Gilbert |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Warren Gillespie ("Plaintiff") alleges wrongful discharge under Montana's Wrongful Discharge from Employment Act ("WDEA") (Count I) and, in the alternative, breach of contract and breach of the implied covenant of good faith and fair dealing (Counts II and III) by Defendant Pneumatic Conveying, Inc. ("Defendant" or "Pneu-Con"). Complaint [ECF No. 2-1].[1] Presently before the Court is Defendant's motion for summary judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. *See* Defendant Pneumatic Conveying, Inc.'s Motion for Summary Judgment [ECF No. 99]. For the reasons discussed below, Defendant's Motion for Summary Judgment is granted in part and denied in part.

---

[1] Defendant says Count IV of the Complaint, for declaratory judgment as to restrictive covenants in the Employment Agreement, is moot because the restrictive period has expired and because Defendant agreed not to enforce the covenants. Motion [ECF No. 101] at n.2 (citing Defendant's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment [ECF No. 100] ("DSOF") at ¶ 66). Plaintiff agrees this is undisputed. Plaintiff's Response to Defendant's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment [ECF No. 107] ("Resp. to DSOF") at ¶ 66. Accordingly, Count IV is dismissed as moot.

# I.    BACKGROUND

The following facts are not disputed, except where otherwise noted, and are taken from the parties' Local Rule 56.1 statements of facts and/or responses thereto.[2] Pneu-Con is a company that designs, manufactures, installs and services custom dry bulk material conveying solutions for the food, chemical, and pharmaceutical industries. Resp. to DSOF [ECF No. 107] at ¶ 1. The company is headquartered in Ontario, California, where its only facility is located. [*Id.*] at ¶ 2. Pneu-Con was founded by Plaintiff's father, Wayland Gillespie, and Plaintiff began working there in 1979. [*Id.*] at ¶¶ 3-4. In 2000, Plaintiff assumed a general manager position and oversaw the management of the company. [*Id.*] at ¶ 4; Resp. to SOAF [ECF No. 110] at ¶ 1. In 2003, Plaintiff moved to Montana and thereafter traveled between Montana and California to perform his job duties, while charging his travel expenses to Pneu-Con. Resp. to DSOF [ECF No. 107] at ¶¶ 5-6.

In 2017, Wayland Gillespie sold Pneu-Con to Hadley Capital Fund III Management, LLC ("Hadley"), a private equity group, in a stock deal. Resp. to DSOF [ECF No. 107] at ¶ 7. A condition of the sale was that Pneu-Con enter into an Employment and Noncompetition Agreement ("Employment Agreement") with Plaintiff which, among other provisions, made Plaintiff the President of Pneu-Con with an annual base salary of $250,000 and a potential annual bonus of $50,000. [*Id.*] at ¶¶ 9-11. Hadley represented in its Letter of Intent to Plaintiff's father that Pneu-

---

[2] *See generally* DSOF [ECF No. 100]; Resp. to DSOF [ECF No. 107]; Plaintiff's Statement of Additional Facts that Require Denial of Defendant's Motion for Summary Judgment [ECF No. 108] ("SOAF"); Defendant Pneumatic Conveying, Inc.'s Response to Plaintiff's Statement of Additional Facts [ECF No. 110] ("Resp. to SOAF").

Con would enter into an employment agreement with Plaintiff where his compensation would be consistent with the $250,000 to $300,000 that Plaintiff had earned as a general manager. Resp. to SOAF [ECF No. 110] at ¶¶ 3-4. Under the employment agreement entered into by the parties ("Employment Agreement"), Plaintiff's initial term was from February 20, 2017 to February 28, 2019, after which Plaintiff's employment automatically renewed on an annual basis unless Plaintiff was otherwise terminated. Resp. to DSOF [ECF No. 107] at ¶ 12; *see also* Exhibit A to Complaint [ECF No. 2-1]. The Agreement provided Pneu-Con had the right to terminate it for cause with written notice and a 30-day cure period for certain categories of cause. Resp. to DSOF [ECF No. 107] at ¶ 13. If Pneu-Con terminated Plaintiff's employment without cause, Plaintiff was entitled to severance pay as set forth in the Employment Agreement, in the amount of approximately $200,000. [*Id.*]; Resp. to SOAF [ECF No. 110] at ¶ 46.

As President, Plaintiff was responsible for all management responsibilities for the company. Resp. to DSOF [ECF No. 107] at ¶ 16. To some extent, the parties dispute how the company performed in 2017 and 2018 during Plaintiff's initial term. Defendant acknowledges "the Company's performance rebounded in 2018" and "at the end of 2018, . . . Pneu-Con reported its best performance to-date in terms of revenue and profits." *See* Resp. to DSOF [ECF No. 107] at ¶ 25; Resp. to SOAF [ECF No. 110] at ¶¶ 14-16. Pneu-Con's 2018 Fourth Quarter Report to investors stated that market conditions deteriorated substantially . . . due to a number of 'macro influences'. . .". Resp. to SOAF [ECF No. 110] at ¶ 17. In April 2019, Pneu-Con was

experiencing significant liquidity issues and the company's shareholders had to infuse the business with $500,000 to keep it solvent. Resp. to DSOF [ECF No. 107] at ¶ 26. Plaintiff participated in the capital raise by purchasing newly issued stock for $23,810. Resp. to SOAF [ECF No. 110] at ¶ 23.

In July 2019, Pneu-Con hired Kevin Melendy as its Chief Executive Officer ("CEO"). Resp. to DSOF [ECF No. 107] at ¶ 31. Plaintiff's relationship with Melendy became strained within the first few months of Melendy's employment. [*Id.*] at ¶ 32. On January 6, 2020, Melendy sent a letter to Paul Wormley, the chairman of Pneu-Con's Board of Directors, proposing a plan that would reduce Plaintiff's base compensation to $175,000. Resp. to SOAF [ECF No. 110] at ¶ 36. At that time, Melendy did not understand that Plaintiff's Employment Agreement would automatically renew in February 2020, and Melendy and Wormley believed they could opt not to renew the Agreement and instead negotiate a consulting agreement. [*Id.*] at ¶¶ 36-38. Sometime in February 2020, Melendy informed Plaintiff that Pneu-Con would no longer pay for Plaintiff's travel expenses from Montana to California, and that Plaintiff should instead work from home. [*Id.*] at ¶ 40. On February 28, 2020, Plaintiff's Employment Agreement automatically renewed. [*Id.*] at ¶ 39.

Plaintiff had long term relationships with Pneu-Con's network of third-party sales representatives, and sales representatives and customers spoke negatively about Melendy to Plaintiff. Resp. to DSOF [ECF No. 107] at ¶¶ 33, 35. In early 2020, Pneu-Con was having difficulty coming up with the cash to pay commissions to its third-party sales representatives. Resp. to DSOF [ECF No. 107] at ¶ 36. One third-

party sales representative, RL Scott, complained that it was not receiving commissions. Resp. to SOAF [ECF No. 110] at ¶ 33. An email chain titled "RL Scott commissions" dated January 29, 2020 and continuing through February 12, 2020 refers to RL Scott emailing Defendant "about rep commissions." *See* Gillespie Dep. Ex. 11 [ECF No. 102-4] at 26. In the initial email, Melendy inquires whether Plaintiff had "communicated with [RL Scott]" that "we were paying him on the 12th as we discussed" and Plaintiff responded "I did talk to [RL Scott] about the commission being paid in February. I didn't give him a date. He is still waiting for an official response from you or Bruce on when he is getting the commission payment." [*Id.*] The exchange continues with a disagreement between Plaintiff and Melendy about whether Plaintiff had informed RL Scott about the date for the commission payment and who should have communicated with RL Scott about the status of the payment. [*Id.*] In an email to Wormley dated February 29, 2020, Plaintiff provided contact information for sales representatives who had complained about Melendy, but Wormley did not speak to those representatives and instead forwarded the message to Melendy. Resp. to SOAF [ECF No. 110] at ¶ 34; *see also* Gillespie Dep Ex. 21 [ECF No. 102-4] at 75 (February 29, 2020 email from Plaintiff to Wormley providing contact information for, among others, two sales representatives from RL Scott).

Plaintiff, Melendy, and Wormley exchanged messages in February 2020 and early March 2020 regarding a proposal for a new role for Plaintiff at the company. Resp. to DSOF [ECF No. 107] at ¶ 43. Plaintiff and Wormley met in person on March 6, 2020 to discuss the proposal. On March 10, 2020, however, Plaintiff sent a message

indicating that he did not believe the proposed new position would provide the same salary as contained in his Employment Agreement. Resp. to DSOF [ECF No. 107] at ¶¶ 44-45; Resp. to SOAF [ECF No. 110] at ¶ 42. California's stay-at-home order in response to the spread of COVID-19 was issued on March 19, 2020. Resp. to SOAF [ECF No. 110] at ¶ 43.

On May 6, 2020, Melendy sent a message to Wormley inquiring as to the status of negotiating a new agreement with Plaintiff. In response, Wormley proposed presenting Plaintiff with the option of either accepting a new employment contract with different compensation or terminating Plaintiff's employment. Resp. to SOAF [ECF No. 110] at ¶ 45. In Melendy's May 6, 2020 email to Wormley, Melendy stated "[a]ccording to the lawyers, I think the reality is we need to pay [Warren] for two years anyway, so let's get to the next stage as fast as possible;" Wormley understood Melendy's statement to be in reference to the two-year severance provision in the Employment Agreement pursuant to which Pneu-Con was required to pay Plaintiff if he was terminated without cause. [*Id.*] at ¶ 48. Melendy testified that after Plaintiff refused to agree to a new position and compensation, Melendy identified three options, one of which was terminating Plaintiff for cause and dealing "with the legal issues associated with that." [*Id.*] at ¶ 50. At some point between May 7, 2020 and May 20, 2020, Melendy presented an ultimatum to Plaintiff that he either accept the new agreement with reduced compensation or he would be terminated. [*Id.*] at ¶ 51. Plaintiff responded by proposing that Pneu-Con pay his severance and negotiate a

buyout of his stock. [*Id.*] at ¶ 52. Pneu-Con did not agree to that proposal. [*Id.*] at ¶ 53.

On May 29, 2020, Pneu-Con sent Plaintiff a letter stating it would terminate the Employment Agreement for cause. [*Id.*] at ¶ 54; *see also* Gillespie Dep Ex. 29 [ECF No. 102-4] at 99-105 ("May 29, 2020 Letter"). The May 29, 2020 Letter listed, among other reasons, that Plaintiff had failed to comply with Board directives to "Develop Strategic Plan" and "create a mission statement" and "install a companywide scorecard"; to "train BV Sarma on quoting and outside supplier integration processes"; "to develop a tool to assess the current rep network"; and with Key Performance Indicators ("KPI") "to interview and find reps in four areas of the country currently not serviced" by Pneu-Con; and "to develop a training process for BV . . .with specifics of needed topics to be determined by you by February 1, 2020 . . ." Gillespie Dep Ex. 29 [ECF No. 102-4] at 99-105. Defendant says Plaintiff does not dispute that he did not achieve these directives and KPI; Plaintiff acknowledges that he did not complete some aspects of these tasks, but disputes whether the tasks were duties assigned to him as President rather than objectives from which to determine eligibility for a bonus. *See* Resp. to DSOF [ECF No. 107] at ¶ 23; *see* Gillespie Dep. [ECF No. 108-1] at 211-214, 218-20, 222-25.

In the May 29, 2020 Letter, Pneu-Con also stated Plaintiff had "taken your personal grievances outside the business and brought them to the attention of reps, stakeholders and other employees. You have fabricated stories of people lying, created instability with our sales organization that dramatically affected our revenue, and

actively undermined business decisions made by management. In addition, you actively told reps that they should not work with the company and (*sic*) wait until Pneu-Con's CEO was removed or fired. . ." Gillespie Dep Ex. 29 [ECF No. 102-4] at 99-105. Plaintiff acknowledges that Pneu-Con employees, sales representatives and customers complained and spoke negatively about Melendy, but Plaintiff disputes that he communicated to those people that he agreed with them or that he said such things to sales representatives. Resp. to DSOF [ECF No. 107] at ¶¶ 34-35.

The May 29, 2020 Letter lists reasons for terminating Plaintiff which Pneu-Con had never previously mentioned to Plaintiff as cause for termination. Resp. to SOAF [ECF No. 110] at ¶ 55. The letter also included as cause for termination matters that occurred in 2018 and 2019 that Pneu-Con informed Plaintiff about more than 30 days before his termination, [*Id.*] at ¶ 56, and it appears that Pneu-Con's communication of these matters to Plaintiff may have been in the May 29, 2020 Letter rather than at some earlier time in those previous years.

Plaintiff did not contact Melendy, Wormley or anyone else at Pneu-Con to tell them he could not address the issues in the May 29, 2020 Letter. Resp. to DSOF [ECF No. 107] at ¶ 61. Pneu-Con sent Plaintiff a letter dated July 2, 2020, stating the company was terminating Plaintiff for cause. [*Id.*] at ¶ 64.

## II. PLAINTIFF'S CLAIMS

In Count I of the Complaint, Plaintiff alleges wrongful discharge under Montana law on the grounds that (1) he was not terminated for good cause, (2) he was terminated in retaliation for his refusal violate public policy or for reporting a

8

violation of public policy, and (3) he was terminated in violation of Defendant's personnel policies. Complaint [ECF No. 2-1]. Counts II and III are pled in the alternative to Count I, the statutory wrongful discharge claim. [*Id.*] Count II alleges breach of the Employment Agreement on the grounds that Defendant did not terminate Plaintiff for cause under the Agreement and that Defendant failed to compensate Plaintiff for a termination without cause under the Agreement. [*Id.*] Count III alleges breach of the implied covenant of good faith and fair dealing on the grounds that Defendant sought to reduce substantially Plaintiff's compensation under the Agreement and when he refused to accept a reduction in pay, Defendant denied Plaintiff the tools to perform his job, terminated him, and informed Plaintiff his shares in the company would be repurchased for zero dollars. [*Id.*]

### III.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant seeks summary judgment on Plaintiff's claim for wrongful discharge under the WDEA and on the two contractual claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *See* Defendant Pneumatic Conveying, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment [ECF No. 101] ("Motion").

Defendant argues summary judgment in its favor on Count I, Plaintiff's statutory wrongful discharge claim, is warranted because his contract for employment (the "Employment Agreement") is for a specific term and therefore is excluded from the scope of the WDEA. Motion [ECF No. 101] at 8-9. Alternatively, Defendant contends that even if the wrongful discharge claim is appropriate under

the WDEA, Plaintiff cannot succeed on a claim under any of the various prongs of the WDEA. [*Id.*] at 9-13. Defendant says Plaintiff cannot prevail on a WDEA claim for retaliation based on refusing to engage in or report a public policy violation related to fair payment of commissions because Montana does not have a public policy related to payment of commissions that is set forth in any constitutional provision, statute or administrative rule as is required by the WDEA. [*Id.*] at 10. Defendant also contends the evidence establishes that Plaintiff's termination was for good cause and Defendant did not violate its own written personnel policies in terminating Plaintiff as it did. [*Id.*] at 10-13.

As to the contractual claims, Defendant seeks summary judgment on the breach of contract claim in Count II because, as with the WDEA claim, Defendant says it terminated Plaintiff for good cause under the Employment Agreement. Motion [ECF No. 101] at 13-14. Defendant also argues that Plaintiff's damages for the breach of contract claim should be limited to the $200,000 severance payment for a discharge without cause under the terms of the Employment Agreement. [*Id.*] at 14. As to Count III, for breach of implied contractual duties, Defendant argues Plaintiff fails to state a claim for breach of implied contractual duties because he was not an at-will employee and the employment relationship was governed by the Employment Agreement. [*Id.*] at 15 (citing *Fowler v. Dep't of Just., Montana Highway Patrol*, 2024 MT 24, ¶ 16, 543 P.3d 575, 579–80 and *Allmaras v. Yellowstone Basin Properties.*, 248 Mont. 477, 481, 812 P.2d 770, 772 (1991)). Defendant otherwise contends that it

had a fair and honest reason for terminating Plaintiff, and therefore there is no basis for the implied contract claim. [*Id.*] at 15-16.

In Response, Plaintiff argues the at-will provisions allowing for termination without cause in the Employment Agreement take precedence over any specific term and bring the wrongful discharge claim within the scope of the WDEA. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [ECF No. 106] ("Response") at 12-13. Plaintiff contends there is a material question of fact as to whether he was terminated in retaliation for refusing to engage in violations of public policy as to fair pay and commission payments which Plaintiff says arise under Montana and California law. [*Id.*] at 13-14. Plaintiff also says there is a material question of fact as to whether Defendant's stated reasons for terminating his employment were pretextual and not the true reasons for his discharge. [*Id.*] at 15-16.

With respect to the contractual claims, Plaintiff argues the same disputed questions of fact that preclude summary judgment on the WDEA wrongful discharge claim also create disputed facts as to whether Defendant satisfied the for-cause termination requirement under the Employment Agreement. [*Id.*] at 16. As to the breach of the implied contractual duties, Plaintiff says Defendant incorrectly focuses on the viability of such a tort claim while failing to recognize that here duties arise from the existence of a contract. [*Id.*] at 18-19. Finally, Plaintiff says the same factual questions as to whether the grounds for termination were pretextual also preclude summary judgment on the implied duty claim. [*Id.*]

11

In reply, Defendant's position shifts somewhat. *See* Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment [ECF No. 109] ("Reply"). Defendant does not respond to Plaintiff's arguments as to the threshold question of whether Plaintiff can state a claim for wrongful discharge under the WDEA notwithstanding his Employment Agreement. Reply [ECF No. 109] at 2-10. Instead, Defendant focuses on why it says Plaintiff fails to "prove" his termination was retaliatory or for pretextual reasons. [*Id.*] As to the contractual claims, Defendant argues Plaintiff's contract claims in Counts II and III are preempted by Plaintiff's WDEA claim if that claim survives summary judgment. [*Id.*] at 11, 14. Defendant says this preemption argument was raised in its Motion, but the Court notes that although Defendant cited the relevant statutory provision, it did not provide any further explanation or argument as to preemption. [*Id.*] at 11 (citing Motion [ECF No. 101] at 13). For this reason, the Court allowed Plaintiff to file a surreply addressing the preemption issue. [ECF No. 116.] Defendant's Motion is fully briefed and ripe for decision by the Court.

## IV. ANALYSIS

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by

"some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A fact presents a 'genuine issue' if it is 'one on which a reasonable factfinder could find for the nonmoving party.'" *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (quoting *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 370 (7th Cir.1997)); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 2024 WL 3823150, at *5 (N.D. Ill. Aug. 14, 2024), *reconsideration denied*, 2024 WL 4615768 (N.D. Ill. Oct. 30, 2024) ("Rather, a genuine dispute of material fact exists 'if the evidence is such that a reasonable [factfinder] could return a verdict' for the nonmovant.") (quoting *Anderson*, 477 U.S. at 248)). A fact is material if it might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992).

The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carrol v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door Cty Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

The Court's role is "to determine whether there is a genuine issue for trial," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citations and quotations marks omitted), without "weigh[ing] evidence, mak[ing] credibility determinations,

resolv[ing] factual disputes and swearing contests, or decid[ing] which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Thus, in making that determination, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## B. Preemption of the Contractual Claims in Counts II and III

Under Montana law, "[a] threshold determination in cases alleging wrongful termination is whether the parties' relationship is governed by a written contract for a specific term or whether it falls under the provisions of the WDEA." *Solle v. W. States Ins. Agency, Inc.*, 999 P.2d 328, 331 (Mont. 2000) (citing Mont. Code Ann. § 39–2–912(2)). This is because the WDEA "preempts common-law remedies." *Blehm v. St. John's Lutheran Hosp.*, 246 P.3d 1024, 1027 (Mont. 2010) (citing Mont. Code Ann. § 39–2–913, "Preemption of common-law remedies. Except as provided in this part, no claim for discharge may arise from tort or express or implied contract."). Thus, "Montana's WDEA is the exclusive remedy for an employee's wrongful discharge claim." *Brodock v. Nevro Corp.*, 2021 WL 1138168, at *2 (D. Mont. Mar. 25, 2021) (citing Mont. Code Ann. § 39-2-902). "Claims which are unrelated to an alleged wrongful discharge are not pre-empted, while claims which are inextricably intertwined with a discharge are barred under the statute." *Eaton v. Silversmiths*, 2021 WL 777857, at *2 (D. Mont. Mar. 1, 2021) (quoting *Beasley v. Semitool, Inc.*, 853 P.2d 84, 86-87 (Mont. 1993)). In addition, "[t]here are exceptions to the WDEA's exclusivity, including when an employee is covered by 'a written contract of

employment for a specific term.'" *Brodock*, 2021 WL 1138168, at *2 (quoting Mont. Code Ann. § 39-2-912(2)).[3]

Defendant initially argued Plaintiff's Employment Agreement was excluded from the scope of the WDEA because it was a contract for a specific term, pointing to an evergreen provision providing for the automatic renewal of Plaintiff's employment unless it was otherwise terminated. Motion [ECF No. 101] at 8-9. In response, Plaintiff said the Agreement nevertheless allowed his employment to be terminated without cause (albeit subject to a severance payment) which Plaintiff says rendered his employment essentially at will. Response [ECF No. 106] at 12-13. Therefore, Plaintiff argued his wrongful discharge claim is viable under the WDEA notwithstanding the Employment Agreement. [*Id.*] In Reply, Defendant does not address Plaintiff's argument that he can state a wrongful discharge claim under the WDEA. Instead, Defendant says Plaintiff concedes his contractual claims are based on the same facts as the wrongful discharge claim and therefore the contract claims are preempted by the exclusivity provisions of the WDEA. Reply [ECF No. 109] at 10-11, 14-15. In his Surreply, Plaintiff argues the contractual claims were pled in the alternative to the WDEA claim. Plaintiff's Surreply in Opposition to Defendant's Motion for Summary Judgment [ECF No. 119] ("Surreply") at 1-2. This case, however, is well beyond the pleading stage and Plaintiff concedes "the WDEA and breach of contract claims are necessarily alternative" such that if "this court holds that under

---

[3] The Employment Agreement contains a choice of law provision selecting Montana law. Exhibit A to Complaint [ECF No. 2-1] at ¶ 4.3.

Montana law the provision permitting Pneu-Con to terminate Warren without cause overrides any other term provision, his employment is at-will and governed by the WDEA." Surreply [ECF No. 119] at 2.

Accordingly, the Court must first decide if Plaintiff's Employment Agreement was for a specific term to determine whether Plaintiff can state a claim for wrongful discharge under the WDEA and if so, whether Plaintiff's contractual claims related to his termination are therefore preempted. As discussed above, Defendant's initial argument that the Employment Agreement was for a specific term was premised on a provision providing for an initial 24-month term that would be automatically renewed. Plaintiff argued that notwithstanding this clause, his employment remained at-will because he could be terminated by Defendant at any time without cause (subject to severance obligations). Response [ECF No. 106] at 12-13. Thus, Plaintiff says his wrongful discharge claim is not excepted under the WDEA provisions for employment contracts with a specific term.

The relevant clause defining the "Employment Period" states the "initial term" of 24 months of employment "shall automatically renew on an annual basis, unless terminated as provided herein." Exhibit A to Complaint [ECF No. 2-1] at ¶ 1.2. This clause concludes "[t]he Employment Period shall at all times be subject to the termination provisions set forth in Section 3 hereof." [*Id.*] Section 3 of the Agreement addresses various grounds for termination of Plaintiff's employment, including Section 3.2 ("Termination by Employer for Cause") and Section 3.3 ("Termination by Employer without Cause"). The Termination without Cause clause provides:

16

Employer may terminate this Agreement and Employee's employment without Cause, for any reason, effective immediately. If Employer terminated Employee without Cause, Employer shall pay to Employee the Base Pay earned but unpaid through the date of termination, accrued and unpaid vacation and expense reimbursements plus the greater of (i) the Base Pay in effect as of the date of termination for the remainder of the Initial Employment Period or the remainder of the applicable Renewal Period of (ii) $100,000 per year for a period of two years (the 'Severance'); provided, however that Employee (a) executes and delivers to Employer a general release in form reasonably satisfactory to Employer and such release is not revoked within the applicable revocation period, and (B) complies with the restrictive covenants set forth in Section 2.

Exhibit A to Complaint [ECF No. 2-1] at ¶ 3.3.

The Court agrees with Plaintiff that the Agreement, which provides that his employment could be terminated without cause at any time for any reason, is not a contract for a specific term that is excepted from the scope of the WDEA. *See Brodock*, 2021 WL 1138168, at *2 ("[i]f an employment contract for a specific term also allows the employer to terminate at will (after completion of the probationary period), it is not a 'written contract for a specific term' under [Mont. Code Ann. § 39-2-912].") (quoting *Brown v. Yellowstone Club Operations, LLC*, 255 P.3d 205, 208 (Mont. 2011)).

Although the parties did not raise this issue, the Court also considers the significance of the severance payment requirement in the Employment Agreement. In *Brown*, the Montana Supreme Court considered an employment agreement for a three-year term that similarly provided for termination without cause at any time, but which required, like the Employment Agreement here, a severance payment conditioned on the employee executing a general release of claims against the

17

employer. *Id.*, 255 P.3d at 206–07. The Montana Supreme Court concluded the agreement was not for a specific term (the three-year period) such that it was excepted from the WDEA because the at-will provision allowing for termination without cause trumped the specific term provisions of the agreement. *Id.*, 255 P.3d at 207–08. "A discharged employee covered by such a contract is not excluded by § 39–2–912, MCA, from bringing a claim under the Wrongful Discharge from Employment Act." *Id.* The severance requirement in the Employment Agreement here therefore does not alter the Court's conclusion that the Agreement was not for a specific term and is not excepted from the WDEA.

Plaintiff suggests the Court could find the term provisions of the Employment Agreement to be ambiguous, leaving questions of fact for the jury to potentially decide, citing *Wurl v. Polson Sch. Dist. No. 23*, 127 P.3d 436, 441–42 (Mont. 2006). Surreply [ECF No. 119] at 2.[4] As the court acknowledged in *Wurl*, "[t]he initial

---

[4] The Court notes the parties have stipulated to a non-jury trial. *See* [ECF No. 95] ("pursuant to Federal Rule of Civil Procedure 39(a)(1), Gillespie hereby stipulates to a non-jury trial on all issues and claims. Pneu-Con and Pneu-Con Holdings join in said stipulation."); *see also* [ECF No. 96]. Accordingly, the Court construes this, as well as Plaintiff's other references to what a reasonable jury could determine at trial, to be an argument that disputed questions of fact remain for the Court, as the factfinder, to resolve in a bench trial in this case. *See O'Hara v. National Union Fire Insurance Co. of Pittsburgh*, 642 F.3d 110, 116 (2d Cir. 2011) (where "the district court would have been the factfinder at trial, the district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact," and unless "the parties stipulate to a 'summary trial' or a 'bench trial "on the papers," ' " a district court is "obliged to proceed in traditional summary judgment fashion" even in a nonjury case) (internal citations omitted); *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 1515120, at *5 (S.D.N.Y. May 13, 2022) (acknowledging that parties and courts occasionally speak "loosely and imprecisely" in "using the word 'jury' in lieu of the word 'factfinder'"); *see also Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983) (where "the record suggests that the tribe did not stipulate to a trial based on the documents before the court" Seventh Circuit applied "the traditional standard that summary

determination of whether an ambiguity exists in a contract, however, is a question of law for a court to determine." *Id.* (concluding "the employment contract's language regarding the MA is clear and unambiguous and, therefore, involves a question of law rather than fact"). Plaintiff does not identify any ambiguities in the Employment Agreement. Instead, Plaintiff argues it "provides that Pneu-Con could terminate [Plaintiff] immediately without notice for no reason – that is, at-will employment." Response [ECF No. 106] at 13. Plaintiff acknowledges "[a]ssuming no ambiguities, the court can decide that question as a matter of statutory and contractual interpretation." Surreply [ECF No. 119] at 2. As neither party has identified any ambiguities in the termination without cause provision of the Employment Agreement, the Court finds that clause to be unambiguous.

Although some contract claims may not be preempted by the WDEA if they are factually distinct from the wrongful discharge claim, the Court notes Plaintiff does not argue that is the case for his contractual claims here. *See Kulm v. Montana State Univ.-Bozeman*, 948 P.2d 243, 245 (Mont. 1997). Rather, Plaintiff concedes "the same facts that give rise to a genuine issue of material fact for his wrongful discharge claim under the WDEA also create a genuine issue of material fact regarding satisfaction of the 'cause' requirement for termination for cause under the Employment Agreement." *See* Response [ECF No. 106] at 16. As Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims are both premised

---

judgment will not lie unless, construing all inferences in favor of the party against whom the motion is made, no genuine issue of material fact exists").

on his alleged wrongful termination, these two claims are inextricably intertwined with the wrongful discharge claim. *See Kulm*, 948 P.2d at 246 (holding plaintiff's claims, including claim of breach of the "implied duty of good faith and fair dealing," were "inextricably intertwined with and based upon his termination from employment" because the claims "are premised upon his early termination from employment and are thus preempted by the WDEA").

In sum, Plaintiff's Employment Agreement is not excepted from the scope of the WDEA and Plaintiff's contractual claims are inextricably intertwined with the same facts giving rise to the statutory wrongful discharge cause of action. Accordingly, the WDEA preempts Plaintiff's contractual claims that his termination violated express or implied provisions of the Employment Agreement. *See Eaton v. Montana Silversmiths*, 2020 WL 9175284, at *5–6 (D. Mont. Aug. 3, 2020), *report and recommendation adopted sub nom. Eaton v. Silversmiths*, 2021 WL 777857 (D. Mont. Mar. 1, 2021) (dismissing breach of contract claims as "barred by the WDEA's exclusivity provisions" where contract claims were inextricably intertwined with plaintiff's wrongful discharge claim and "do not constitute separate and independent claims which could have been asserted in the absence of his discharge"); *Kulm*, 948 P.2d at 246 (affirming grant of summary judgment dismissing claim for breach of implied contractual duty of good faith and fair dealing as preempted by WDEA; "We agree with the District Court that Kulm's claims are inextricably intertwined with and based upon his termination from employment" noting "if MSU had not acted on its decision to terminate Kulm after one year, he would have no grievance").

20

Therefore, the Court grants the Motion as to Counts II and III of Plaintiff's Complaint and will enter judgment in Defendant's favor on Counts II and III.

### C. Plaintiff Need Not Prove His WDEA Claim; He Need Only Identify Genuine Questions of Material Fact to Avoid Summary Judgment On That Claim

As an initial matter, the Court agrees with Plaintiff that Defendant improperly focuses its arguments on whether Plaintiff has *proven* his WDEA wrongful discharge claim. *See* Surreply [ECF No. 119] at 1. *See also* Motion [ECF No. 101] at 2 ("Because Gillespie cannot prove the fundamental elements of these causes of action, his claims must be dismissed."). That is not the standard applied at summary judgment. *See*, *supra*, Section II(A). As to Defendant's Motion, "[t]he Court begins by viewing the facts and making all reasonable inferences in the light most favorable to [Plaintiff], the party opposing summary judgment." *Ross v. UChicago Argonne, LLC*, 2023 WL 2745678, at *1 (N.D. Ill. Mar. 31, 2023) (citing *Reives v. Illinois State Police*, 29 F.4th 887, 891 (7th Cir. 2022) and *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017)). "In the context of a motion for summary judgment, the Court does not 'make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.'" *Id.* (citing *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003)).

For these reasons, the Court takes Defendant's essential argument to be that the undisputed facts of record show Plaintiff cannot prevail on his claims as a matter of law. It is to that argument the Court now turns.

21

### 1) Summary Judgment is Warranted on Plaintiff's WDEA Retaliatory Wrongful Discharge Claim

Under the retaliation prong of the WDEA, a discharge is wrongful if "it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy." Mont. Code Ann. § 39-2-904. To state a retaliation claim under the WDEA, a plaintiff must identify a public policy that is established by a constitutional provision, statute or administrative rule. *See* Mont. Code Ann. § 39-2-907(7) (defining "public policy" as "a policy in effect at the time of the discharge concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule"); *see also Dundas v. Winter Sports, Inc.*, 410 P.3d 177, 180 (Mont. 2017) (affirming grant of summary judgment for employer on retaliation claim under WDEA where plaintiff "failed to establish any constitutional provision, statute or administrative rule that WSI violated or that he reported"). The Montana Supreme Court has interpreted the WDEA's public policy provision as addressing Montana's interest in enforcing Montana laws. *See Fenno v. Mountain W. Bank*, 192 P.3d 224, 230 (Mont. 2008) ("The WDEA's retaliatory discharge provision, § 39–2–904(1)(a), MCA, similarly exists to protect the State's interest in enforcing State policies "concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule", citing Mont. Code Ann. § Section 39–2–903(7)).

### a. Plaintiff does not identify applicable Montana public policy upon which to base his WDEA claim.

Plaintiff contends Defendant ran afoul of the retaliation provision of the statute by terminating Plaintiff's employment in retaliation for his refusal to violate

Montana's public policy of "fair pay," a public policy that Plaintiff says was implicated by Defendant's practices related to commission payments to third party sales representatives. *See* Response [ECF No. 106] at 13-15. Plaintiff's position that "Montana authority holds that 'fair pay' is indeed a matter of public policy properly subject to a retaliation claim under the WDEA" is based on Plaintiff's reading of *Harrell v. Farmers Educ. Co-op Union of Am., Montana Div.*, 2013 MT 367, ¶ 86, 314 P.3d 920, 938-39. Defendant disputes that *Harrell* holds there is an actionable Montana public policy of "fair pay" for purposes of a retaliation claim under the WDEA. Reply [ECF No. 109] at 2-3.

As an initial matter, *Harrell* does not create any exception to Montana's statutory requirement that an actionable public policy for purposes of a WDEA retaliation claim must be established in a constitutional provision, statute, or administrative rule. For this reason alone, the language Plaintiff references from *Harrell* does not identify a "public policy" for purposes of a retaliation claim under the WDEA.

Moreover, *Harrell* does not stand for the proposition that Montana has a generalized public policy of "fair pay" that can provide the basis for a retaliation claim under the WDEA, let alone such a policy in relation to commission payments to third-party sales representatives. The plaintiff in *Harrell* alleged "three wage claims under the Wage Protection Act, § 39–3–201 et seq., MCA" including claims for plaintiff's overtime pay, vacation hours, and payment for extra duties he allegedly performed without being compensated after the prior executive director had departed. *Id.*, 314

P.3d at 928. The plaintiff also alleged constructive discharge under the WDEA, claiming he was forced to quit due to hostility toward him in the workplace after he asserted his Wage Protection Act rights. *Id.* at 926. The plaintiff prevailed on a jury verdict on the statutory Wage Protection Act claims, but on appeal the Montana Supreme Court found the claims for overtime and vacation pay were barred by the statute of limitations. *Id.*, at 928-930. The Supreme Court rejected the employer's claim that it was entitled to a new trial on the plaintiff's constructive discharge claim under the WDEA, however, stating "[w]hile the wage claims are barred by the statute of limitations, the jury still properly could find that Harrell's *refusal to violate public policy by asserting his statutory right to wages* prompted his constructive discharge." *Id.*, at 938 (emphasis added). Thus, consistent with the statutory language defining an actionable "public policy" as established by a constitutional provision, statute, or administrative rule, the Montana Supreme Court in *Harrell* specifically identified the plaintiff's complaints about violations of the Montana wage statute as the basis for his retaliation claim under the WDEA.

Plaintiff's "fair pay" argument is based on other language in *Harrell* that there was sufficient evidence to send Plaintiff's prayer for punitive damages to the jury in the context of his constructive discharge claim: "the evidence was sufficient to establish that MFU retaliated against Harrell for a multitude of reasons that all implicate public policy: for refusing to waive his right to overtime and vacation, for insisting on fair pay for the work that he was performing, and for challenging MFU's

practices that he believed were unfair to its female employees." *Id.*, 314 P.3d at 938-39.

This statement is specific to the facts and claims in *Harrell*, although the Court acknowledges the Montana Supreme Court's language is somewhat unclear. On the one hand, the reference to retaliation against the plaintiff for reasons that "implicate public policy" related to "insisting on fair pay for the work that he was performing" may echo the plaintiff's complaint that he was owed wages for extra work he had performed. The Montana Supreme Court, however, found that was not a proper claim for wages arising under Montana's Wage Protection Act. *Id.*, at 928, 930-31 ("Harrell's third claim under the wage statutes regarding 'extra duties' does not meet the definition of a wage claim under the statute" but could "perhaps add[] to his constructive discharge theory" under the WDEA). On the other hand, the language about retaliation for the plaintiff "insisting on fair pay" could also be read to refer more generally to the plaintiff's statutory wage claims that would have been proper if they were not time-barred and which the Montana Supreme Court held were properly the basis of the plaintiff's WDEA constructive discharge claim. *Id.*, at 938. The Court believes the latter interpretation of the Montana Supreme Court's statement makes more sense in the context of the Supreme Court's opinion.

In any event, the Montana Supreme Court assuredly did not say there was a generalized public policy in Montana of "fair pay" that can support a WDEA retaliation claim. Interpreting the language in *Harrell* in this manner would be contrary to the statutory requirement that any actionable public policy be established

25

in a constitutional provision, statute, or administrative rule. *See* Mont. Code Ann. § 39-2-907(7). This statutory requirement serves to ensure clarity and certainty in identifying a public policy that can provide the basis for a retaliation claim. *See Mason v. Pro. Transportation, Inc.*, 2020 WL 12880469, at *7 (D. Mont. Oct. 13, 2020) (where plaintiff claimed he was discharged for reporting defendant's public safety violation of failing to equip vehicles with winter tires, plaintiff's identification of "general 'purpose' statutes" related to highway traffic and driver improvement, among other things, was "not sufficiently specific to support claim under § 904(1)(a)" as those statutes "do not contain any specific public safety requirements. . . or set forth any specific requirements applicable to motor vehicles, tires, or other equipment. . ."). There is no reason to believe the Montana Supreme Court was recognizing a public policy of "fair pay" under Montana law in such an off-hand manner, without citation to any source for such a broadly stated public policy, in connection with a ruling that a punitive damage claim properly went to the jury. Nor does Plaintiff explain how a purported Montana "fair pay" public policy for payment for extra work performed by the plaintiff in *Harrell* would reflect a Montana public policy concerning the payment of commissions to third-party sales representatives.

For all these reasons, the Montana Supreme Court's language that Plaintiff relies upon cannot fairly be read to encompass a claim arising from Plaintiff's supposed concern or any interactions about whether third party sales representatives were  receiving commissions in a timely manner. The Court declines to read *Harrell* as holding that "fair pay" broadly speaking is a public policy under Montana law that

can provide the basis for Plaintiff's retaliation claim under the WDEA under these circumstances. Critically, Plaintiff has not identified a Montana public policy established by constitutional provision, statute, or administrative rule related to payment of commissions to third-party sales representatives that can provide a legal basis for his WDEA retaliation claim. Plaintiff's WDEA retaliation claim based on Montana public policy therefore fails as a matter of law.

### b. California public policy on commission payments for sales representatives cannot provide the basis for a WDEA retaliatory wrongful discharge claim.

Plaintiff also argues that his retaliation claim is premised on California's public policy of fair payment of commissions to sales representatives. Response [ECF No. 106] at 14-15. Plaintiff says Defendant is subject to California laws governing commission payments because it is a manufacturing company headquartered in Ontario, California where Defendant's only facility is located. [*Id.*] at 14. Plaintiff identifies California regulations governing commission payments to third-party sales representatives which Plaintiff says include requirements for written contracts specifying the method and timing of commission payments. [*Id.*] (citing Cal. Civ. Code §§ 1738.13, 1738.15 and California Labor Code §§ 200, 204). Defendants respond that "an alleged violation of the laws of California cannot be cited as a basis to prove a violation of Montana's wrongful discharge statute." Reply [ECF No 109] at 3-4.[5]

---

[5] Defendant also argues Plaintiff improperly raised this California policy argument for the first time at the summary judgment stage. Reply [ECF No. 109] at 4 (citing *Outlaw v. Regis Corp.*, 525 F. App'x 501, 503 (7th Cir. 2013)). In *Outlaw*, a plaintiff sought to raise a new claim for the first time in opposition to a motion for summary judgment and the district court refused to consider it because the "newly filed claim arose out of other time periods and from other decision makers than [plaintiff's] other claims." *Outlaw*, 525 F. App'x at 503. The

As noted above, the Montana Supreme Court has interpreted the WDEA's public policy provision as specifically addressing *Montana's* interest in enforcing *Montana* laws. *See Fenno v*, 192 P.3d at 230; *see also Mason, Inc.*, 2020 WL 12880469, at *7 (describing WDEA retaliation provision as existing "to protect the State's interest in enforcing state policies, and protects employees who take steps in their employment to promote the enforcement of Montana's laws and regulations," citing *Fenno*). Plaintiff provides no authority to support his contention that he can rely on California public policy for purposes of a retaliatory discharge claim under the WDEA.

Accordingly, the Court finds Plaintiff cannot rely on a California public policy related to the timely payment of commissions to third-party sales representatives for purposes of a WDEA retaliatory wrongful discharge claim. For this reason, Plaintiff's WDEA retaliation claim based on California public policy also fails as a matter of law.

### 2) Material Questions of Fact Preclude Summary Judgment on Plaintiff's WDEA Claim that He Was Wrongfully Discharged Without Good Cause

Plaintiff also claims his discharge was wrongful under the WDEA because he was not terminated for good cause. Response [ECF No. 106] at 15 (citing Mont. Code. Ann. § 39-2-904(1)(b)). "Good cause" means "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the

---

circumstances here are different, as Plaintiff's retaliation claim was alleged in the Complaint. Defendant does not explain how it is prejudiced by Plaintiff's legal arguments regarding the relevance of California public policy, does not contend it was deprived of the opportunity to take any relevant discovery, and, as noted above, does not appear to dispute California law applied to commission payments to its sales representatives. Accordingly, the Court considers Plaintiff's legal arguments about California public policy.

employer's operation, or other legitimate business reason." Mont. Code. Ann. § 39-2-903(5). "A 'legitimate business reason' is a reason 'that is not false, whimsical, arbitrary, or capricious, and one that must have some logical relationship to the needs of the business.'" *Shepherd v. Dep't of Corr.*, 529 P.3d 1285, 1289–90 (Mont. 2023) (quoting *Davis v. Montana, Dept. of Public Health and Human Servs.*, 357 P.3d 320, 322 (Mont. 2015)). "[W]hen the employer moves for summary judgment on a WDEA claim, it has the initial burden to establish that no issues of material fact as to good cause exist." *Miracle v. Signal Peak Energy, LLC*, 2024 WL 343217, at *4 (D. Mont. Jan. 30, 2024). "Courts 'must be cautious in second guessing employment decisions" in cases involving managerial employees.'" *Shepherd*, 529 P.3d at 1289–90 (quoting *McConkey v. Flathead Elec. Coop.*, 125 P.3d 1121 (Mont. 2005)). "An employer has broad discretion 'to terminate a person in an executive position.'" *Id.* (quoting *Baumgart v. State*, 332 P.3d 225 (Mont. 2014)).

"After the employer's initial showing, the burden shifts to the employee 'to show specific facts upon which to reasonably conclude that the given reason for discharge was: (1) not a job or business-related reason; (2) false; (3) not the true reason for discharge; or (4) arbitrary, capricious, or whimsical.'" *Shepherd*, 529 P.3d at 1289–90 (quoting *Buckley v. W. Mont. Cmty. Mental Health Ctr.*, 485 P.3d 1211 (Mont. 2021)). "Mere denial, speculation, or cursory assertion to the contrary is insufficient to satisfy the employee's responsive burden." *Id.*

Defendant argues the evidence established it discharged Plaintiff "not just for one of the available grounds for good cause-but for all of the available grounds for

good cause." Motion [ECF No. 101] at 11. Plaintiff responds by arguing a reasonable jury could conclude from the evidence that Defendant's stated reasons for terminating Plaintiff's employment were pretextual and thus not the true reason for discharge. Response [ECF No. 106] at 15-16.[6] Plaintiff points to evidence that Defendant's stated grounds for "cause" were only identified after its other efforts to reduce Plaintiff's compensation failed and to avoid a severance payment under the Employment Agreement for a termination without cause. [*Id.*] at 15.

In Reply, Defendant argues "[t]he fact that [Defendant] may have had additional reasons for [Plaintiff's] discharge, or that [Plaintiff] may surmise alternative reasons for the discharge, is not material" because "such alternative reasons for discharge do not preclude summary judgment." Reply [ECF No. 109] at 8 (relying on *Baumgart v. State, Dep't of Com.*, 332 P.3d 225, 230–33 (Mont. 2014)). Defendant contends *Baumgart* held that where the employer presented evidence supporting good cause for a discharge, the employee's belief that the stated reason was pretextual and that her termination was motivated by political discrimination was irrelevant. [*Id.*] Defendant says such "additional reasons were immaterial because the evidence supporting a non-pretextual reason for discharge was not disputed" and that an employer has discretion in making such determinations with respect to managerial employees like Plaintiff. [*Id.*] at 9. Defendant argues its "motivation to terminate [Plaintiff] to 'avoid having to continue paying [Plaintiff] his high salary or any severance payment' is therefore inconsequential because the

---

[6] This reference to "a reasonable jury" is misplaced in this case as no jury demand was filed and any trial will be a bench trial.

Company cited an undisputed business reason for termination and maintained broad discretion in dealing with his performance as President." [*Id.*]

Defendant misapplies *Baumgart* to the circumstances here, where Plaintiff has identified evidence that creates a disputed fact question about whether Defendant's stated reasons for discharge are pretextual. In *Baumgart*, the plaintiff, a former administrator of the Montana Tourism and Promotion Division of the Department of Commerce, was discharged for failing to manage a portion of her budget, resulting in a risk that certain unused funds would be "swept" or re-appropriated by the state legislature. *Baumgart*, 332 P.3d at 226. The court found the plaintiff failed to present evidence to raise a genuine issue of material fact as to whether her employer possessed a legitimate business reason to terminate her employment because she did not "refute the existence of the budget problem or her admissions that she did not understand her Division's budget." *Id.*, 332 P.3d at 232. The court then addressed whether the employer's budgetary reason was pretext, stating "[t]he Dissent correctly notes, 'An employee may establish an issue of fact for trial if she can prove 'that the given reason for the discharge ... is a pretext and not the honest reason for the discharge.'" *Id.*

As to pretext, the plaintiff in *Baumgart* claimed her termination was politically motivated, pointing to the fact that she was a Republican, while the Department's new director and Montana's then-Governor (who appointed the director), were Democrats, as well as other circumstantial evidence about her dealings in the Department. *Id.*, 332 P.3d at 226, 229-30. The court found "it is undisputed that [the

plaintiff] presented no direct, non-speculative evidence that [her superior] or anyone else with decision-making power at [the employer] knew she was a Republican." *Id.*, 332 P.3d at 229-30. The court observed "mere denial or speculation will not suffice" to create a disputed fact question as to pretext and found the plaintiff had "failed to present substantial evidence or specific facts to establish that her discharge was politically motivated." *Id.*, 332 P.3d at 232. Summary judgment was appropriate notwithstanding the pretext argument because the plaintiff "failed to present any evidence of other underlying reasons for her termination, aside from her unsupported allegations of political motivation . . ." *Id.* Thus, it was the lack of evidence supporting the stated pretextual reason that warranted summary judgment in *Baumgart*, not merely, as Defendant contends, the plaintiff's failure to present evidence disputing the employer's stated reasons for her discharge.

Defendant, therefore, is wrong that its "motivation" in terminating Plaintiff is "inconsequential" so long as it has provided undisputed evidence supporting a legitimate business reason for the discharge. Rather, as stated in *Baumgart*, summary judgment is appropriate where "[t]he evidence that supports a *non-pretextual reason* for [plaintiff's] discharge is not disputed." *Id.*, 332 P.3d at 232 (emphasis added). As the Montana Supreme Court has explained, "an employer is entitled to summary judgment if it presents evidence of reasonable, job-related grounds for the termination *and the employee fails to submit evidence that the given reason is a pretext and not the honest reason for the discharge.*" *See Putnam v. Cent. Montana Med. Ctr.*, 460 P.3d 419, 423–26 (Mont. 2020) (emphasis added); *see also*

*Becker v. Rosebud Operating Servs.,* 191 P.3d 435, 441 (Mont. 2008) (internal citations omitted) ("To defeat a motion for summary judgment on the issue of good cause, the employee may *either* prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'") (emphasis added); *Marcy v. Delta Airlines*, 166 F.3d 1279, 1284 (9th Cir. 1999) ("A close review of the WDEA case law reveals that the Montana Supreme Court will find that the stated reason for an employee's discharge is not legitimate under the WDEA if the reason given for the employee's discharge: (1) is invalid as a matter of law under the WDEA; (2) rests on a mistaken interpretation of the facts; or (3) is not the honest reason for the discharge, but rather a pretext for some other illegitimate reason. A discharged employee need only prove that one of these three types is true in her case to demonstrate that the reason for her discharge was not legitimate.").

Accordingly, the Court must consider more than just whether Defendant's stated reasons provide good cause for termination; rather, the Court must "consider the record as a whole." *See Roedocker v. Farstad Oil, Inc.*, 2018 WL 1152002, at \*2–4 (D. Mont. Mar. 5, 2018) (rejecting magistrate judge's finding that plaintiff's offensive text message provided employer with a legitimate business reason, and thus good cause, to fire plaintiff; noting "considering whether the text provided Farstad with a 'legitimate business reason,' and thus good cause, for Roedocker's termination requires the Court to consider more than just the text itself.").

Here, in contrast to *Baumgart*, Plaintiff has identified evidence in support of his claim that Defendant's stated reasons for his termination were pretextual and that Defendant was instead motivated to avoid a contractual obligation to pay Plaintiff a severance for a termination without cause under the Employment Agreement. Plaintiff cites a May 6, 2020 email between Wormley and Melendy in which Melendy stated "[a]ccording to the lawyers, I think the reality is we need to pay [Warren] for two years anyway, so let's get to the next stage as fast as possible" and that Wormley understood that "to be in reference to the two-year severance provision in [Plaintiff's] Employment Agreement, which [Defendant] was required to pay [Plaintiff] if [Defendant] terminated [Plaintiff] without cause." Defendant concedes this is undisputed. Resp. to SOAF [ECF No. 110] at ¶ 48. The parties dispute whether Melendy believed there were grounds to terminate Plaintiff for cause as of May 7, 2020, [*id.*] at ¶ 49, focusing on interpretations of Melendy's testimony that one option for dealing with Plaintiff's employment was "terminating [Plaintiff] for cause and dealing 'with the legal issues associated with that.'" [*Id.*] at ¶ 50. The parties agree that on May 20, 2020, Plaintiff "proposed that [Defendant] should just offer [Plaintiff] his severance and negotiate a buyout of his stock" but ultimately Plaintiff was not offered such a proposal. [*Id.*] at ¶¶ 52-53.

Plaintiff also identifies disputed facts about whether or when Defendant had previously raised the performance grounds for his discharge. Plaintiff disputes that Defendant had previously informed him of the various performance problems that were included in the May 29, 2020 Letter. *See* Resp. to DSOF [ECF No. 107] at ¶¶

37-50. Defendant acknowledges "the May 29, 2020 letter lists a (*sic*) causes for terminating [Plaintiff], which [Defendant] never previously mentioned to [Plaintiff] as cause for termination." Resp. to SOAF [ECF No. 110] at ¶¶ 54-56. Defendant also says that certain matters listed in the letter "occurred in 2018 and 2019," but appears to concede Defendant first informed Plaintiff of those matters in the May 29, 2020 Letter itself, just over 30 days before Plaintiff was discharged. [*Id.*] at ¶¶ 55-56. This dispute about the timing of Defendant's communication of the various performance issues that Defendant says provide cause for Plaintiff's discharge also supports the Court's conclusion that questions of fact remain as to whether Defendant's stated reasons for discharge were pretextual.[7]

In Reply, Defendant does not address the substance of the evidence that Defendant's stated reasons for terminating Plaintiff were pretextual. Instead, Defendant argues its motivations are "inconsequential" because it "cited an undisputed business reason for termination." Reply [ECF No. 109] at 9.[8] As the Court

---

[7] *See Moe*, 371 P.3d at 426–29 (affirming trial court's finding that questions of fact precluded summary judgment on whether asserted grounds for termination was pretextual; "[d]rawing all reasonable inferences in favor of [plaintiff], the first time that she became aware of . . . concerns with her communication methods was" less than two weeks before she was placed on leave) (distinguishing facts in *Baumgart*, where the plaintiff "failed to correct her mistakes for five consecutive year"); *Bird v. Cascade Cnty.*, 386 P.3d 602, 605–09 (Mont. 2016) (considering timing of employer's notice of performance problems that were stated as basis for discharge: "For starters, the employee in *Moe* had only a short time to rectify the problems her superiors identified in her performance before she was terminated. Here, the Board brought to Bird's attention the need to improve her working relationships nearly two years before she was terminated.").

[8] For purposes of this MOO, the Court assumes for the sake of argument that at least some of the stated reasons in Defendant's letter are undisputed and would constitute legitimate business reasons for Plaintiff's termination. The Court recognizes that Plaintiff disputes at least some performance problems that were described in the May 29, 2020 Letter, Response [ECF No. 106] at 15, while Defendant says Plaintiff admitted some of the stated issues were

explained, Defendant's view is based on an incorrect reading of the cited case law. "When there is a genuine dispute of material fact about whether an employer's stated reason for discharging an employee is the true motivation for the discharge or when there exists a genuine dispute as to the reason for discharge, it is appropriate for the Court to deny the employer's motion for summary judgment." *Cowger v. Signal Peak Energy*, 2023 WL 6307440, at *4 (D. Mont. Sept. 28, 2023) (affirming denial of summary judgment for employer where there was a dispute about the employer's reason for discharge); *Austin v. Walgreens Co.*, 2020 WL 948927, at *1–2 (D. Mont. Feb. 27, 2020) (affirming denial of cross-motions for summary judgment where "[a] jury could determine that Walgreens had good cause to terminate Austin based on his violation of" company policy "but, drawing all reasonable inferences in favor of Austin, the jury could also determine that Walgreens did not demonstrate good cause, or that it was a pretext for terminating Austin."). Drawing all reasonable inferences in Plaintiff's favor, the evidence permits a reasonable conclusion that Defendant's stated grounds for terminating Plaintiff were not the true reasons for his discharge and Defendant instead sought to avoid its obligations to pay Plaintiff a severance under the Employment Agreement. That is enough, at this stage of the case, for Plaintiff to proceed to trial on this claim.[9]

---

true. Reply [ECF No. 109] at 7-8. Nevertheless, because the Court finds there is a disputed question of fact as to whether Defendant's stated reasons were pretextual and that is a basis for denying summary judgment, the Court need not resolve the extent to which there are disputes about the stated business reasons for termination in Defendant's letter.

[9] Plaintiff's Complaint also included a wrongful discharge claim under the WDEA based on the allegation that his termination was in violation of Defendant's personnel policies. *See* Complaint [ECF No. 2-1] at ¶ 40. Plaintiff now represents he is not proceeding with a wrongful discharge claim on this basis. Response [ECF No. 106] at 16 (describing Defendant's

For all these reasons, the Court denies Defendant's Motion for Summary Judgment on the WDEA wrongful discharge claim.

## V. CONCLUSION

For all the above reasons, Defendant Pneumatic Conveying, Inc.'s Motion for Summary Judgment [ECF No. 99] is denied as to Count I (Wrongful Discharge) of the Complaint and granted as to Count II (Breach of Contract) and Count III (Breach of the Implied Covenant of Good Faith and Fair Dealing) of the Complaint. Count IV (Declaratory Judgment) of the Complaint is dismissed as moot as both parties agree that Count is no longer operative. *See* p. 1, fn. 1, *supra*.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: February 27, 2025

---

arguments as to why there were no disputed facts regarding the claim that Defendant violated its personnel policies by discharging Plaintiff as a "red herring," stating "[i]t is undisputed that Pneu-Con had no written personnel policies applicable to executives at the time of [Plaintiff's] termination"); *see also* Surreply [ECF No. 119] at 7 (Plaintiff's "entire WDEA claim survives even if there was no 'written personnel policy' for Pneu-Con to violate"). Accordingly, there appears to be no dispute that Defendant did not violate its written personnel policies in discharging Plaintiff and the Court need not address this theory of liability under the WDEA.